CARLTON v DEPARTMENT OF CORRECTIONS

Docket No. 160706. Submitted June 13, 1995, at Lansing. Decided February 20, 1996, at 9:00 A.M. Leave to appeal sought.

Adrian Carlton brought an action in the Court of Claims against the Department of Corrections, the director of the department, and the warden of the Huron Valley Men's Facility, seeking damages for injuries he sustained from a fire he set inside his prison cell. Following a bench trial, the court, James R. Giddings, J., granted a judgment and awarded damages to the plaintiff, finding the department liable under the public building exception to governmental immunity from tort liability and all the defendants liable for violations of the prohibition against cruel and unusual punishment under US Const, Am VIII and of the prohibition against cruel or unusual punishment under Const 1963, art 1, § 16. The defendants appealed.

The Court of Appeals *held:*

1. The Court of Claims erred in determining that a dangerous or defective building condition existed because the fire detection system in the unit of the prison where the plaintiff was incarcerated did not have a smoke detector in each cell. A facility not configured in the most modern design possible is not necessarily in a dangerous or defective condition. The public building exception does not apply where, as here, proper supervision offsets any shortcomings in configuration.

2. The director and the warden were sued by the plaintiff in their official capacities, not their personal capacities, and thus were subject to the exclusive jurisdiction of the Court of Claims over claims for money damages against state officers relating to actions taken in official capacities.

3. The plaintiffs' Eighth Amendment claim is a claim for damages under 42 USC 1983. Neither the state nor a state official sued in an official capacity is a "person" that can be sued for money damages under § 1983. The Court of Claims

REFERENCES

Am Jur 2d, Civil Rights § 264; Municipal, County, School, and State Tort Liability §§ 75, 78; Penal and Correctional Institutions § 189.
See ALR Index under Civil Rights and Discrimination; Governmental Immunity or Privilege; Prisons and Prisoners.

erred in finding the defendants liable for the alleged Eighth Amendment violation.

4. A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates US Const, Am VIII and Const 1963, art 1, § 16. Deliberate indifference arises when the prison official knows of and disregards an excessive risk to inmate health or safety. In this case, the strict observance by corrections officers of a policy to handcuff inmates in administration segregation, like the plaintiff, before such inmates leave their cells, did not constitute deliberate indifference to a risk of harm to the plaintiff, given the circumstances and the actions taken by the officers to extinguish the fire and ensure the plaintiff's health and safety.

Reversed.

1. GOVERNMENTAL IMMUNITY — PUBLIC BUILDING EXCEPTION.

The duty imposed by the public building exception to governmental immunity from tort liability relates to dangers actually presented by the building itself; the purpose of the exception is to promote the maintenance of safe public buildings, not necessarily safety in public buildings.

2. GOVERNMENTAL IMMUNITY — PUBLIC BUILDING EXCEPTION.

An area not configured in the most modern design possible is not necessarily in a dangerous or defective condition for purposes of the public building exception to governmental immunity from tort liability; the exception does not apply where proper supervision offsets any shortcomings in configuration.

3. COURTS — COURT OF CLAIMS — JURISDICTION.

The Court of Claims has exclusive jurisdiction to hear claims against the state and any of its instrumentalities for money damages; the jurisdiction also extends to suits against state officers where the officers were acting in their official capacities when committing the acts complained of (MCL 600.6419; MSA 27A.6419).

4. CIVIL RIGHTS — STATE — STATE OFFICIALS.

Neither the state nor a state official sued in an official capacity is a "person" for purposes of a damage suit under 42 USC 1983.

5. CONSTITUTIONAL LAW — VIOLATION BY THE STATE — DAMAGES.

The state is liable for damages for a violation of the state constitution by a state official or employee only in cases where a state custom or policy mandated the actions of the official or employee.

6. PRISONS AND PRISONERS — RISK OF HARM TO INMATES — CONSTITU-
    TIONAL LAW.

    A prison official's deliberate indifference to a substantial risk of
    serious harm to an inmate violates US Const, Am VIII and
    Const 1963, art 1, § 16; deliberate indifference arises when the
    prison official knows of and disregards an excessive risk to
    inmate health or safety.

*Fraser Trebilcock Davis & Foster* (by *Michael C. Levine*), for the plaintiff.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Leonard J. Malinowski,* Assistant Attorney General, for the defendants.

Before: SMOLENSKI, P.J., and HOOD and M. J. CALLAHAN,* JJ.

SMOLENSKI, P.J. Defendants Michigan Department of Corrections (DOC); Robert Brown, Jr., director of the DOC; and Tekla Miller, warden of Huron Valley Men's Facility (HVMF), appeal as of right a judgment entered in favor of plaintiff Adrian Carlton by the Court of Claims following a bench trial. We reverse.

In November 1989, plaintiff, while incarcerated in HVMF's unit 2, received burn injuries when he negligently or intentionally set a fire in his cell. Plaintiff filed suit against defendants in the Court of Claims, seeking damages for his injuries. Count I of plaintiff's complaint alleged a claim against defendant DOC premised on the public building exception to governmental immunity. Count II of plaintiff's complaint alleged violations of his state and federal constitutional rights against all three defendants.

Following a bench trial, the Court of Claims

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

found defendants liable on all counts. The court entered a judgment against defendants for $67,400, which represented plaintiff's total damages of $337,000 reduced by eighty percent for plaintiff's comparative fault. On appeal, defendants raise a number of issues. We consider only those issues dispositive to a resolution of this case.

I

Defendant DOC argues that the Court of Claims erred in finding it liable under the public building exception to governmental immunity. See MCL 691.1406; MSA 3.996(106); MCL 691.1407; MSA 3.996(107); *Hickey v Zezulka (On Resubmission),* 439 Mich 408; 487 NW2d 106 (1992). Specifically, defendant DOC argues that plaintiff failed to prove a dangerous or defective condition of a public building. *Hickey, id.* at 421-422, states the applicable law concerning what constitutes a dangerous or defective condition of a public building:

> In general, governmental agencies "are subject to liability for a dangerous or defective condition of a public building without regard to whether it arises out of a failure to repair and maintain." . . . A public building may be dangerous or defective because of improper design, faulty construction, or absence of safety devices. . . . However, a court should only look to the uses or activities for which the public building is assigned to determine if a dangerous or defective condition exists. . . . Clearly, the question is not only whether the physical condition caused the injury incurred, but also whether the physical condition was dangerous or defective under the circumstances presented.

The duty imposed by the public building exception relates to dangers actually presented by the building itself. *Id.* at 422. Moreover, the purpose of

the public building exception is to promote the maintenance of safe public buildings, not necessarily safety in public buildings. *Id.* Thus, where proper supervision offsets any shortcomings in the configuration of the room, the public building exception does not apply. *Id.*

In *Lockaby v Wayne Co,* 406 Mich 65, 74-77 (LEVIN, J.), 81-82 (WILLIAMS, J.), 84 (MOODY, J.); 276 NW2d 1 (1979), our Supreme Court held that the plaintiff, a jail inmate, stated a claim under the building exception where his complaint alleged that his spinal cord injuries were caused by the absence of a safety feature, i.e., a lack of padding in the cell in the " 'mental' section" where he had been held.

In *Hemphill v Michigan,* 173 Mich App 335, 337; 433 NW2d 826 (1988), an inmate housed in the psychiatric section of a state prison was burned when he struck a match and set his bed sheet on fire. The burning sheet ignited a polyurethane foam mattress, causing the inmate to suffer severe burns. *Id.* The inmate had a history of attempting to set himself on fire while incarcerated. *Id.* at 338. The mattress was a known fire hazard to persons in confined places because of its propensity to burn. *Id.* at 337. The plaintiff, who was the inmate's guardian, brought suit against the state pursuant to the public building exception. *Id.* The Court of Claims entered a judgment in the plaintiff's favor on the ground that the burning mattress constituted a building defect. *Id.* at 337-338.

This Court reversed on the ground that the public building exception was inapplicable, first, because the mattress was not a part of the building, and, second, "because the fire resulted as much from [the inmate's] own act and inadequate supervision as from a dangerous condition" of a public building. *Id.* at 339-340.

In *Williamson v Dep't of Mental Health,* 176 Mich App 752; 440 NW2d 97 (1989), the trial court found that the drowning death of the plaintiffs' decedent, a known epileptic and slightly retarded patient at a residential care facility owned or operated by the defendant, was proximately caused both by negligent supervision and by a defective condition of a public building. Specifically, the court stated that the bathing room where the decedent drowned was specifically assigned for use as a bathing and showering place for the decedent, and that, in light of this use, the bathing room constituted a defective condition:

> The complexity of the valves contained in the control box, their location in relation to the showers and bathtub, valve "D" which automatically and unnecessarily activated all three showers when one wanted only to activate the bathtub, the inability to hear the water being drawn in the bathtub while the showers were on, the failure to have monitors, alarms, video cameras, or other protective devices which would alert the staff that a patient was drawing water in the bathtub all constitute a dangerous and defective condition, due to the design of the shower and bathing facility at [the facility], within the meaning of [the public building exception] . . . . Defendant had a complex and unwieldy system and was responsible to change it or protect patients from it by the use of one of many available safety devices. [*Id.* at 759.]

This Court affirmed. *Id.* at 760. This Court stated that there may be more than one proximate cause of an injury. *Id.* at 758. This Court further found that the trial court had not clearly erred in finding that the shower and bath facilities constituted a dangerous condition within the meaning of the public building exception.

In *Hickey,* the plaintiff, as the personal repre-

sentative of his deceased son's estate, brought an action in the Court of Claims against Michigan State University (MSU) premised on the public building exception. The plaintiff alleged that the holding cell in the building housing MSU's Department of Public Safety (DPS) was dangerous or defective because the decedent had committed suicide by hanging himself from one of four metal brackets attaching a heating unit to the wall. *Id.* at 416-417. Following a bench trial, the Court of Claims found that the DPS holding cell was dangerous or defective because it had not been constructed as a detoxification cell. *Id.* at 419. On appeal, this Court affirmed on the ground that the Court of Claims did not err in finding that the DPS building was a proximate cause of the decedent's death. *Id.*

Our Supreme Court reversed the decisions of this Court and the Court of Claims on the ground that the DPS holding cell, the heating unit, and the metal brackets were not a dangerous condition under the public building exception and, therefore, MSU was entitled to governmental immunity. *Id.* at 414, 427. In so doing, our Supreme Court rejected the plaintiff's principal arguments for avoiding MSU's governmental immunity defense, including, as relevant to this case, the following argument:

> The plaintiff's claim that MSU should have a detoxification cell and state-of-the-art equipment is also controlled by *Reardon* [v *Dep't of Mental Health,* 430 Mich 398; 424 NW2d 248 (1988)]. In *Reardon,* we held that an area not "configured in the most modern design possible at the time" is not necessarily in a dangerous or defective condition. *Id.* at 417. During the trial, numerous witnesses testified about the appropriate designs, structures and equipment necessary for a holding facility to care for intoxicated persons. The wit-

nesses testified that under some circumstances, a holding facility should have a special detoxification cell for housing intoxicated persons. However, the only fact that was clearly established by all the testimony was that if the DPS building had been up-to-date and had used state-of-the-art technology, [the decedent's] suicide may have been detected earlier and possibly prevented. Under *Reardon,* proving that the MSU facility was not up-to-date or using the most modern designs possible is insufficient. Therefore, the plaintiff cannot avoid MSU's governmental immunity defense by suggesting that state-of-the-art designs and technology were necessary. [*Hickey, supra* at 424.]

Our Supreme Court also rejected the plaintiff's claim that the inability to observe the decedent at all times from the guard station was a design defect where more effective supervision would have overcome this alleged defect. *Id.* at 424. The Court stated that "[b]efore a claim under a building design defect can support invoking the immunity exception, such a design must more directly cause the injury at issue." *Id.*

In this case, unlike the defective piping system in *Williamson, supra,* the Court of Claims specifically found that the existing smoke detectors in the ventilation system of unit 2 did not constitute a dangerous or defective condition of a public building because they had worked properly, "although somewhat delayed simply because of the time needed in order to move smoke from the cell through the venting system to the detector."

However, plaintiff's position at trial was that each cell in unit 2 should have been equipped with automatic smoke detectors as required by the National Fire Protection Association Life Safety Code (LSC) 15.3.4.4. At trial, the parties agreed that the Michigan Legislature had not adopted LSC 15.3.4.4 as applicable to HVMF. However, evidence was

presented that defendant DOC had utilized LSC 15.3.4.4 as an appropriate fire safety standard for HVMF.

Like the factfinder in *Hickey*, the Court of Claims found that the evidence was sufficient to permit it to conclude that the lack of in-cell smoke detectors constituted a dangerous or defective condition of unit 2 and that this defective condition was a proximate cause of plaintiff's injuries:

But, the first notice of the fire, as far as I can tell, was from corrections officer Riley, perhaps one other one. I don't think Nickerson, but one of the other ones. And, before he heard the alarm, he noticed smoke coming out from under the door in 113. I think it's cell number 113.

Now, at that moment the alarm had not sounded, but there was enough smoke in the cell to be coming out from under the door. Not only that, he immediately ran to the cell. That's his testimony, he ran down there, observed that the Plaintiff was on fire, observed there was fire in the cell. *It just seems to me that it's likely that had there been a smoke detector in that cell, as the Life Safety Code, Chapter 15 requires, that that would have been activated, certainly before the Plaintiff was on fire.* Certainly before the fire in the cell reached the level of intensity as observed by Corrections Officer Riley. And, in all likelihood before Officer Riley, either at the same time or probably before Officer Riley saw smoke coming out from under the door, presumably the heat in the room causes things to rise. That would include any smoke that would be rising, presumably, in the room. And, the vent system had not—well, what shut down the vent system was the simultaneously, the activation of the alarm, if I understand the testimony on this record.

So when Riley made that observation, the vent system had not been shut down, but there was enough smoke such that it would be coming from under the door of that cell. That tells me that at

that moment in time, in fact, somewhat earlier in time, there was enough smoke in that room to activate a properly operating smoke detector. At least, such a system as would have been and was mandated by Chapter 15 of the Life Safety Code. And, for that reason it's simply I do not accept and find on this record the fact a properly operating smoke detector system would have activated prior to the time that the alarm system activated. In this case would have activated Officer Riley and any other corrections officer observed [sic] the smoke coming out from under the door of cell 113. And, to that extent this building was defective in that it should have had such an automatic smoke detection system as set forth in Chapter 15. That was the appropriate standard and the technology, as I have indicated, was well known, mandated in certain facilities, unquestionably mandated in new construction long before this particular occurrence, and, in my view it was required in this cell. With use condition five, with restrictions on movement of this Plaintiff and with the situation there at Huron Valley, I believe it was required and the Department understood that it was required. In fact, I'll so find based on that understanding. And, that the failure of the Department of Corrections to provide that system was a building defect within the meaning of [the public building exception.]

And, as a result of that building defect and delay, which was occasioned because it wasn't— the Department employees finding out about this fire and taking steps to extinguish it and taking steps to get the Plaintiff out of that room, that it was a proximate cause of the injuries which he sustained, a proximate cause. [Emphasis supplied.]

In this case, unit 2 was assigned to incarcerate prisoners. Like *Hemphill,* the items that caught fire in plaintiff's cell were not a part of the building, and the fire resulted as much from plaintiff's own negligent or intentional act as from an al-

leged dangerous condition of a public building. Like *Hickey, supra,* our review of the testimony, as well as the trial court's findings, indicates that the only fact that was clearly established was that if each cell in unit 2 had been equipped with a smoke detector, the fire "may have been detected earlier" and plaintiff's injuries "possibly prevented." *Hickey, supra* at 424. However, under *Hickey,* simply proving that the HVMF was not "up-to-date or using the most modern designs possible is insufficient." Moreover, more effective supervision of the prisoners, including the conditions under which they were permitted to smoke, may have prevented the fire. *Id.* at 424; see also *Hemphill, supra.*

Thus, where the Court of Claims found only that an in-cell smoke detection system "likely" would have detected the fire sooner than the existing, properly functioning smoke detection system, we conclude that under *Hickey,* plaintiff cannot avoid the DOC's governmental immunity defense. The Court of Claims erred in finding defendant DOC liable under the public building exception.

II

Defendants Brown and Miller argue that the Court of Claims did not have jurisdiction over them because they were sued in their individual capacities, not their official capacities.

The difference between official-capacity suits and personal-capacity suits was explained in *Kentucky v Graham,* 473 US 159, 165-166; 105 S Ct 3099; 87 L Ed 2d 114 (1985):

Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. . . . Official-capac-

ity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." . . . As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. [Emphasis in original.]

The Court of Claims has exclusive jurisdiction to hear claims against the state and any of its instrumentalities for money damages. MCL 600.6419; MSA 27A.6419; *Kell v Johnson,* 186 Mich App 562, 564; 465 NW2d 26 (1990). This jurisdiction also extends to suits against state officers where the officer was acting in an official capacity when committing the acts complained of. *Kell, supra.*

In this case, we agree with plaintiff that defendants Brown and Miller were sued in their official capacities. Accordingly, the Court of Claims had jurisdiction over these defendants.

III

Next, all three defendants argue that the Court of Claims erred in finding them liable for damages for a violation of the Eighth Amendment's prohibition against "cruel and unusual" punishment. US Const, Am VIII.

42 USC 1983 provides in relevant part as follows:

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any

> State . . . subjects, or causes to be subjected, any
> citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress. [Emphasis supplied.]

"Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York v Detroit (After Remand),* 438 Mich 744, 757-758; 475 NW2d 346 (1991). Neither the state nor a state official sued in an official capacity is a "person" for purposes of a damage suit under § 1983. *Smith v Dep't of Public Health,* 428 Mich 540, 544; 410 NW2d 749 (1987), aff'd sub nom *Will v Michigan Dep't of State Police,* 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989).

In this case, plaintiff correctly conceded below in his response to defendants' motion for summary disposition that pursuant to *Will, supra,* his "§ 1983 claim" failed against defendant DOC, a state agency, and defendants Miller and Brown, sued as they were in their official capacities. However, plaintiff continued to insist below, as he does on appeal, that he could nevertheless proceed against defendants on his "Eighth Amendment" claim. However, in support of his alleged "Eighth Amendment" claim, plaintiff relies on cases where liability of damages for an Eighth Amendment violation is premised on § 1983. See, e.g., *Wilson v Seiter,* 501 US 294; 111 S Ct 2321; 115 L Ed 2d 271 (1991); *Whitley v Albers,* 475 US 312; 106 S Ct 1078; 89 L Ed 2d 251 (1986); *Estelle v Gamble,* 429 US 97; 97 S Ct 285; 50 L Ed 2d 251 (1976).

Plaintiff, as well as the Court of Claims, appar-

ently failed to apprehend that, as indicated previously, § 1983 "itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York, supra* at 757-758. The Court of Claims erred in allowing plaintiff to proceed to trial by simply calling his § 1983 claim by another name.

We note that plaintiff has cited *Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971), on remand 456 F2d 1339 (CA 2, 1972), in support of his arguments concerning his claim for a violation of the state constitution. In *Bivens,* the United States Supreme Court "recognized a cause of action for damages against individual federal officers" for violations of the federal constitution. See *Smith, supra* at 645 (BOYLE, J.). However, because plaintiff's claim in this case involves an action against the *state* and *state officials* for damages for a violation of the federal constitution, we conclude that the theory enunciated in *Bivens* is of no help to plaintiff with regard to his claim premised on the Eighth Amendment. See *Smith, supra* at 627 (BRICKLEY, J.); see also *Federal Deposit Ins Corp v Meyer,* 510 US —; 114 S Ct 996; 127 L Ed 2d 308 (1994) (refusing to extend *Bivens* to support a claim for damages against a federal agency).

Our review of the record fails to reveal any other theory on which plaintiff could have proceeded against the state or its agents, acting in their official capacities, for money damages. Thus, concerning plaintiff's claim premised on the Eighth Amendment, we conclude that plaintiff failed to state a cause of action against these defendants on which relief could be granted. The Court of Claims erred in imposing damages liabil-

ity upon defendants for a violation of the Eighth Amendment.

### IV

Next, defendants argue that the Court of Claims erred in finding them liable for damages for a violation of the Michigan Constitution's prohibition against "cruel or unusual" punishment. See Const 1963, art 1, § 16.

In this case, plaintiff sought damages for a violation of his state constitutional right under Const 1963, art 1, § 16, to a safe prison environment. In order to establish the state constitutional violation, plaintiff relied on federal cases where suit was brought under 42 USC 1983 for violations of a prisoner's Eighth Amendment right to safe prison conditions. See *Wilson, supra; Whitley, supra; Estelle, supra.* Plaintiff sought damages for the alleged state constitutional violation pursuant to the theory enunciated in *Smith, supra.* Thus, in order to place the proceedings at trial in context, we first review the applicable principles of law.

### A

A claim for damages against the state arising from a violation by the state of the Michigan Constitution may be recognized in appropriate cases. *Smith, supra* at 544. Liability for a violation of the state constitution should be imposed on the state only in "those cases in which the state's liability would, but for the Eleventh Amendment, render it liable under the 42 USC 1983 standard for local governments articulated in *Monell v New York City Dep't of Social Services,* 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978)." *Smith, supra* at 642 (Boyle, J.).

In *Monell,* the United States Supreme Court held that a local government would be liable under § 1983 only when the execution of an official policy or custom caused a person to be deprived of federal constitutional rights. *Id.* at 694; see also *York, supra* at 755. The policy or custom must be the moving force behind the constitutional violation in order to establish liability. *Id.* See also *Jackson v Detroit,* 449 Mich 420, 433; 537 NW2d 151 (1995).

Thus, the state will be liable for a violation of the state constitution only "in cases where a state 'custom or policy' mandated the official or employee's actions.' " *Smith, supra* at 642 (BOYLE, J.); see also *Johnson v Wayne Co,* 213 Mich App 143, 150; 540 NW2d 66 (1995); *Marlin v Detroit (After Remand),* 205 Mich App 335, 338; 517 NW2d 305 (1994).[1]

B

In an appropriate case, the Michigan Constitution's prohibition against "cruel or unusual" punishment may be interpreted more broadly than the Eighth Amendment's prohibition against "cruel and unusual" punishment. US Const, Am VIII; Const 1963, art 1, § 16; *People v Bullock,* 440 Mich 15, 30; 485 NW2d 866 (1992). In this case, however, plaintiff does not argue that the Michigan Constitution's "cruel or unusual" provision should be construed more broadly than the Eighth Amendment. Rather, as indicated previously, plaintiff has

[1] Where a plaintiff alleges a state constitutional violation against governmental employees in their individual capacities, the plaintiff must also show "that the alleged constitutional violation occurred by virtue of a custom or policy that the governmental employees were carrying out." *Johnson, supra* at 150-151. As indicated previously, defendants Brown and Miller were sued in their official capacities. The real party in interest is defendant DOC, an arm of the state.

expressly relied on federal precedent construing the Eighth Amendment in support of his claim premised on the Michigan Constitution. Thus, for guidance we look to federal cases concerning the Eighth Amendment. See *York, supra; Johnson, supra* at 152.

The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, ensure that inmates receive adequate food, shelter, and medical care, and take reasonable measures to guarantee the safety of inmates. *Farmer v Brennan*, 511 US —; 114 S Ct 1970; 128 L Ed 2d 811, 822 (1994); *Johnson, supra* at 152-153. Thus, in cases involving prison conditions, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 128 L Ed 2d 820; *Johnson, supra* at 152. Deliberate indifference arises when the prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 128 L Ed 2d 825; see also *Johnson, supra* at 153.

Having summarized the applicable principles of law, we now turn to the proceedings below.

C

The testimony at trial indicated that Donald Riley, a corrections officer, observed smoke coming from beneath plaintiff's cell door. Riley ran to plaintiff's cell door and observed that defendant was on fire. When another officer who was with Riley opened the flap to the cell door's food slot, smoke poured out of the slot. Riley obtained a fire extinguisher located in a cabinet a few feet from plaintiff's cell and began spraying the extinguisher's contents through the food slot at the flames he observed on plaintiff's body and elsewhere in the

cell. Riley extinguished the flames on plaintiff's body with the contents from this first fire extinguisher.

At some point, Riley ran toward the officers' station, obtained a second fire extinguisher, and returned to plaintiff's cell. Although he observed through the food slot only "heavy smoke" in plaintiff's cell at this time, Riley nevertheless sprayed the contents of the second extinguisher through the cell door's food slot.

Either before or after Riley had used the second extinguisher, he told plaintiff several times "to come to the food slot and bend over" to be handcuffed. However, Riley was unable to get a response from plaintiff, who was running back and forth within the cell. Riley also had difficulty seeing plaintiff because of the smoke. Plaintiff finally approached the food slot when Riley gave plaintiff a direct order. Riley then cuffed plaintiff's hands. Riley testified at trial that he did not immediately release plaintiff from his cell when he first observed plaintiff on fire because policy required that prisoners in administrative segregation be handcuffed before being removed from their cells. Plaintiff's expert at trial testified that there should have been some flexibility in the handcuffing policy for life-and-death situations and that Riley's failure to immediately release the burning plaintiff from his cell was "appalling."

Riley and several other officers then unsuccessfully attempted to open the cell door, which had apparently expanded because of the heat from the fire. During this time, another officer arrived on the scene with a breathing apparatus, the mask of which he placed over plaintiff's face, which was now sticking out of the food slot. Riley and at least one other officer went outside unit 2 to plaintiff's cell window and broke a small hole in the window

with a fire extinguisher for the purpose of allowing smoke to escape from the cell. When Riley returned inside unit 2 to plaintiff's cell, the cell door was open. Between five and ten minutes elapsed from the time Riley first became aware of the fire until plaintiff was released from his cell.

In its bench opinion, the court found that it was well known by defendants that fires occurred in penal institutions and that prisoners could be affected. The court also found that an official policy had been promulgated by unknown representatives of defendant DOC whereby prisoners incarcerated in administrative segregation at HVMF could not be released from their cells under any circumstances unless they were handcuffed. The court found that this case involved only prison conditions, i.e., putting out a fire, and that therefore the deliberate indifference standard applied in determining whether plaintiff's constitutional rights had been violated.

The court stated that there was no practical reason why plaintiff's cell door could not have been opened immediately, which would have enabled the corrections officers both to get plaintiff away from the source of danger, thus minimizing his injuries, and to fight the fire more easily. The court found that the delay in removing plaintiff from his cell caused plaintiff "to be subjected to the pain and suffering of his wounds for a longer period of time," and that this delay was "wholly unnecessary." The court found that in light of defendants' knowledge of the risk of fire "it constituted . . . a deliberate indifference to the rights of Mr. Carlton and every other prisoner not to have in place a policy that allowed for known [sic] exception in the case of life threatening emergency."

D

In this case, the trial court's finding that defendants knew that fires occurred at HVMF and that prisoners could be affected by such fires was not clearly erroneous. *Attorney General ex rel Dep't of Natural Resources v Huron Co Rd Comm,* 212 Mich App 510, 515; 538 NW2d 68 (1995). In addition, although conflicting testimony was presented, we conclude that the court's finding that a policy existed whereby prisoners could not be released from their cells unless they were handcuffed was also not clearly erroneous. *Id.*

However, we do not accord the same deference to the court's application of the constitutional standards to these facts. *Id.* See also *People v Nelson,* 443 Mich 626, 631, n 7; 505 NW2d 266 (1993). First, the court's imposition of liability on defendants because they should have had an exception to the handcuffing policy sounds in ordinary negligence. Deliberate indifference, for purposes of an Eighth Amendment violation, entails more than mere negligence. *Farmer,* 128 L Ed 2d 824.

Second, although state custom or policy mandated Riley's actions (refusal to release the burning plaintiff from his cell until plaintiff was handcuffed), the court was required to further determine whether a constitutional violation actually occurred in this case. *Smith, supra* at 642, 648 (BOYLE, J.); *Johnson, supra.* In other words, did Riley's mandated conduct constitute deliberate indifference to a substantial risk of serious harm to plaintiff. *Farmer,* 128 L Ed 2d 820.

Certainly plaintiff established that at the time he was on fire he was incarcerated under conditions posing a substantial risk of serious harm. *Farmer,* 128 L Ed 2d 823. The testimony of the

officers who responded to the fire, particularly Riley, indicate that they knew the burning plaintiff was subject to a substantial risk of serious harm. *Id.* at 825. Thus, the issue becomes whether the handcuffing policy caused the officers to disregard this risk. We must answer this question negatively where, as even found by the trial court, Riley, upon observing plaintiff on fire, took the reasonable measure of immediately obtaining a fire extinguisher and extinguishing all of the fire on plaintiff. Riley then obtained and used a second fire extinguisher on plaintiff's cell. At this point, there is no indication in the record that plaintiff was then subject to a substantial risk of serious harm from the fire. Even assuming that plaintiff was subject to a substantial risk of serious harm from the smoke then in his cell, we cannot find that the officers disregarded this risk where they reasonably placed a breathing mask over his face and attempted to break his cell window. Moreover, although plaintiff's wounds certainly needed tending, there is no indication in the record that plaintiff was then subject to a substantial risk of serious harm from his wounds where he was mobile and able to get to the food slot in his door. In summary, despite the officers acting in conformance with the handcuffing policy, we simply cannot conclude that these officers knew of, yet disregarded, a substantial risk of serious harm to plaintiff. We conclude that the Court of Claims erred in finding defendants liable for a violation of the state constitution.[2]

---

[2] The determination whether the Eighth Amendment has been violated depends upon the type of conduct against which an objection is lodged. *Whitley, supra* at 320. In this case, the undisputed testimony at trial indicated that the purpose of the handcuffing policy was to protect corrections officers because the prisoners in administrative segregation were known security risks and had previously assaulted and stabbed officers. The Court of Claims did not give any weight to

IV

In summary, we conclude that the Court of Claims erred in finding defendant DOC liable under the public building exception. We also conclude that the court erred in finding all three defendants liable in damages for violations of the federal and state constitutions. Accordingly, we reverse the judgment of the Court of Claims.

this testimony. However, in light of this testimony, this case does not appear to be one where deliberate indifference could be established "without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates." *Whitley, supra.* Nevertheless, given our resolution of this case, we need not decide whether the purpose of the handcuffing policy should have been given any constitutional weight. Cf. *Whitley, supra.*