*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANTHONY HART,

        Plaintiff-Appellee,

v

STATE OF MICHIGAN,

        Defendant-Appellant.

UNPUBLISHED
February 7, 2019

No. 338171
Court of Claims
LC No. 16-000212-MM

Before: METER, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

In this action in which plaintiff has alleged claims of constitutional tort based on violations of Const 1963, art 1, §§ 11 (search and seizure) and 17 (due process), defendant appeals as of right the order entered by the Court of Claims denying defendant's motion for summary disposition. For the reasons provided below, we reverse and remand for the court to enter an order of summary disposition in favor of defendant.

## I. BASIC FACTS

In 2001, the Hillsdale Juvenile (Probate) Court adjudicated plaintiff as being in violation of MCL 750.520(e) (misdemeanor fourth-degree criminal sexual conduct) for an incident that took place when he was 16 years old. Plaintiff was designated a "Tier II" sex offender which, under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, required him to report and register his address bi-annually for 25 years. The parties agree, however, that the Michigan Legislature amended the SORA such that, effective July 1, 2011, Tier II offenders who had been adjudicated as juveniles were no longer required or expected to register. See 2011 PA 18; MCL 28.728(4). Consequently, the parties do not dispute that, under the SORA, as amended in 2011, plaintiff was no longer required or expected to register or verify his address with local law enforcement authorities after July 1, 2011, and that his name should have been removed from the registry. See MCL 28.728(9).

Plaintiff alleges that Michigan State Police (MSP) employees Marci Kelley and Melissa Marinoff were the individuals responsible for accurately maintaining the sex offender registry. Despite this legal obligation, no official from MSP removed his name from the registry or

informed him that he was no longer required to continue to register as a sex offender. Consequently, plaintiff continued to register as a sex offender with his local registering authorities from July 2011 through July 2013.

On July 5, 2013, plaintiff registered his address as 79 Budlong in Hillsdale, Michigan, as opposed to 76 Budlong, which was his correct address. As a result of this error, plaintiff was arrested and charged with violating the SORA. On August 14, 2013, plaintiff, on advice of counsel, entered a plea of nolo contendere to failing to register in violation of SORA. Plaintiff was assessed a $325 fine.

Plaintiff further alleges that on January 23, 2014, Hillsdale law enforcement officers were advised that plaintiff had failed to verify his address for the sex offender registry. After learning that law enforcement was looking for him, plaintiff appeared at the Hillsdale County Sheriff's Department where he was once again arrested for failing to comply with SORA reporting requirements. Plaintiff submits that on February 10, 2014, at the request of the police, MSP agent Kelley attested to the validity of plaintiff's "Sex Offender Registry Certified Record," which stated that plaintiff was required to report and register under the SORA on a semi-annual basis until February 20, 2054. Plaintiff and defendant agree that Kelley transmitted these records to Hillsdale law enforcement, and by implication, to prosecutors, for the purpose of establishing probable cause to prosecute plaintiff. On the advice of counsel, plaintiff pleaded guilty to the felony of failure to register and, on March 17, 2014, he was sentenced to 16 to 24 months in prison and was ordered to pay $1,026.94 in fines and costs.

Plaintiff had been incarcerated for 17 months when the Michigan Department of Corrections (DOC) became aware that plaintiff was being detained for a crime it was legally impossible for him to have committed because he had not been subject to any registration requirements. The DOC notified the MSP, and plaintiff was thereafter released from prison, and his convictions and sentences were vacated.

Plaintiff commenced this action against defendant on August 24, 2016, alleging violations of Article 1, §§ 11 (search and seizure) and 17 (due process) of the Michigan Constitution. On December 5, 2016, defendant moved for summary disposition premised on MCR 2.116(C)(7), asserting that the claims were barred by sovereign immunity, and MCR 2.116(C)(8), asserting that plaintiff failed to adequately allege a constitutional tort claim because he alleged that the state employees violated a law or policy but did not allege that a state custom or policy mandated the employees' actions.

The Court of Claims denied defendant's motion. With respect to the sovereign immunity question, the court noted that governmental immunity was not a defense to a constitutional tort claim. And with respect to the failure to allege that a state custom or policy mandated the employees' actions, the court noted that such claims can be maintained when the policy or custom was the moving force behind the constitutional violation which, in appropriate circumstances, can include the failure to train officials. The court stated that, in any event, liability will only be imposed when there is "deliberate indifference" on the part of a defendant, which includes knowledge and a conscious disregard of a known danger. In reviewing the sufficiency of plaintiff's complaint, the court found that plaintiff's failure-to-train allegations were sufficient to survive summary disposition because

the complaint alleges that Defendant had actual notice that law enforcement officials would use the information on the SOR [sex offender registry] to make decisions about arrest and prosecutions for SORA violations. Yet, in spite of this knowledge, Defendant neither properly trained its officers with regard to understanding the changes to SORA, nor did Defendant make the requisite efforts to ensure that the SOR was accurate, according to ¶ 80 of the complaint. And, according to the complaint, these omissions ultimately led to Plaintiff's arrest for violating SORA and led to the seizure, loss of liberty, and other harm alleged by Plaintiff.

Consequently, the court held that plaintiff had alleged sufficient facts to survive defendant's motion for summary disposition under MCR 2.116(C)(8).

## II. STANDARD OF REVIEW

We review a trial court's decision on a motion for summary disposition de novo. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). Defendant moved for summary disposition pursuant to MCR 2.116(C)(7) and (C)(8).

MCR 2.116(C)(7) provides that a motion for summary disposition may be raised on the ground that a claim is barred because of immunity granted by law. When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. [*Dextrom v Wexford Co*, 288Mich App 406, 428-429; 789 NW2d 211 (2010) (citations omitted).]

And "MCR 2.116(C)(8) tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. The motion must be granted if no factual development could justify the plaintiffs' claim for relief." *Spiek*, 456 Mich at 337.

## III. ANALYSIS

## A. IMMUNITY

Defendant first argues that the Court of Claims erred when it ruled that defendant was not entitled to sovereign immunity. We disagree.

From the time of Michigan's statehood, our Supreme Court's jurisprudence has recognized that the state, as sovereign, is immune from suit unless it consents. *Manion v State*

*Hwy Comm'r*, 303 Mich 1, 19; 5 NW2d 527 (1942); see also *Odom v Wayne Co*, 482 Mich 459, 477; 760 NW2d 217 (2008).[1] "Immunity from tort liability, as provided by MCL 691.1407[2] [of the governmental tort liability act (GTLA), MCL 691.1401, *et seq.*], is expressed in the broadest possible language—it extends immunity to all governmental agencies for *all* tort liability whenever they are engaged in the exercise or discharge of a governmental function." *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 155; 615 NW2d 702 (2000). However, the GTLA also provides several exceptions to this broad grant of immunity. *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 84; 746 NW2d 847 (2008).[3] Moreover, "[w]hen the language of a limiting statute is straightforward, clear, and unambiguous, it must be enforced as written." *Mays v Governor*, 323 Mich App 1, 26; 916 NW2d 227 (2018), lv pending, citing *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007). It is undisputed that none of these statutory exceptions pertains to a claim for damages arising from the violation of a constitutional right.

---

[1] Our Supreme Court has explained that while the terms "sovereign immunity" and "governmental immunity" have been used interchangeably over the years, the terms truly are not synonymous. *Pohutski v City of Allen Park*, 465 Mich 675, 682; 641 NW2d 219 (2002).

> *Sovereign* immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State. The reason is the State is the only sovereignty in our system of government, except as the States delegated part of their implicit sovereignty to the Federal government.
>
> * * *
>
> Over the years, by judicial construction, this "sovereign" immunity has been transmogrified into "governmental" immunity and made applicable to the "inferior" divisions of government, i.e., townships, school districts, villages, cities, and counties, but with an important distinction. These subdivisions of government enjoyed the immunity only when engaged in "governmental" as distinguished from "proprietary" functions. [*Id.* (quotation marks and citation omitted).]

[2] MCL 691.1407(1) states, "Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise of discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed." And the GTLA defines "governmental agency" as "this state or a political subdivision." MCL 691.1401(a).

[3] "The six statutory exceptions are: the highway exception, MCL 691.1402; the motor-vehicle exception, MCL 691.1405; the public-building exception, MCL 691.1406; the proprietary-function exception, MCL 691.1413; the governmental-hospital exception, MCL 691.1407(4); and the sewage-disposal-system-event exception, MCL 691.1417(2) and (3)." *Wesche*, 480 Mich at 84 n 10.

Despite this apparent immunity to constitutional tort liability, the Michigan Supreme Court has held, in a memorandum opinion, that "[w]here it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action," and that "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987); see also *Mays*, 323 Mich App at 87 ("The governmental immunity statutes do not apply where, as here, a plaintiff has alleged violations of the Michigan Constitution."). But because *Smith* produced no less than five opinions, with one justice not participating, a majority of justices never agreed on what constituted "appropriate" circumstances under which a plaintiff could seek monetary damages from the state based on a constitutional violation. Regardless, this Court has relied on Justice Boyle's opinion in *Smith* to hold that "the state will be liable for a violation of the state constitution only in cases where a state custom or policy mandated the official's or employee's actions." *Reid v Michigan*, 239 Mich App 621, 628-629; 609 NW2d 215 (2000), citing *Smith*, at 642 (BOYLE, J., concurring and dissenting in part) and *Carlton v Dep't of Corrections*, 215 Mich App 490, 504, 505; 546 NW2d 671 (1996); see also *Mays*, 323 Mich App at 62-63; *Rusha v Dep't of Corrections*, 307 Mich App 300, 305; 859 NW2d 735 (2014).

Because we are bound by the decisions of our Supreme Court in which a majority of justices have agreed, and by the published opinions of this Court issued after November 1, 1990, see MCR 7.215(J)(1), we hold that sovereign immunity is not a defense to constitutional tort claims.[4] Accordingly, the Court of Claims did not err when it denied defendant's motion for summary disposition on this ground.

## B. FAILURE TO STATE A CLAIM

Defendant next argues that, even if plaintiff's suit is not barred on the basis of immunity, plaintiff's claims must be dismissed because he has not alleged sufficient facts to have stated a claim upon which relief can be granted.[5] This time, we agree.

---

[4] Defendant's argument that *Smith* and its progeny only addressed "governmental" immunity instead of "sovereign" immunity is not persuasive. The memorandum opinion in *Smith* never engaged in any analysis to distinguish between the concepts of governmental immunity and sovereign immunity. Indeed, as the Court of Claims noted, "it would make little sense for the Court in *Smith* to hold that a claim for damages arising from a violation of the state's constitution 'may be recognized in appropriate cases,' while simultaneously holding that sovereign immunity barred all such claims." Moreover, as already noted, the Michigan Supreme Court has recognized that, although the terms sovereign and governmental are not truly synonymous, they nonetheless "have been over the years used interchangeably in decisions." *Pohutski*, 465 Mich at 682 (quotation marks and citation omitted).

[5] Typically, a plaintiff must make a threshold showing that a constitutional violation occurred. See *Mays*, 323 Mich App at 57; *Marlin v Detroit (After Remand)*, 205 Mich App 335, 338; 517 NW2d 305 (1994). But the parties at the Court of Claims and here on appeal do not address this threshold issue. Indeed, defendant's motion for summary disposition is not premised on this

"This Court has held that liability for a violation of the state constitution should be imposed on the state only where the state's liability would, but for the Eleventh Amendment, render it liable under the standard for local governments as set forth in 42 USC 1983 and articulated in *Monell v New York City Dep't of Social Services*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978)." *Reid*, 239 Mich App at 628, citing *Carlton*, 215 Mich App at 504. Consequently, pursuant to *Monell*, "the state will be liable for a violation of the state constitution only in cases where a state custom or policy mandated the official's or employee's actions." *Reid*, 239 Mich App at 628-629; see also *Mays*, 323 Mich App at 62-63. A state is liable only for its *own* actions and cannot be vicariously liable solely on the basis of actions by its employees. These requirements are essential for liability to attach under a § 1983 claim. See *Connick v Thompson*, 563 US 51, 60; 131 S Ct 1350; 179 L Ed 2d 417 (2011); *Payton v Detroit*, 211 Mich App 375, 398; 536 NW2d 233 (1996). Thus, a state custom or policy must have been the "moving force" primarily responsible for the actions of an employee and thus the constitutional violation. *Carlton*, 215 Mich App at 505, citing *Monell*, 436 US at 694.

Defendant argued in the Court of Claims, and on appeal in this Court, that plaintiff has not identified any particular custom or policy that was the moving force behind the purported constitutional violations. In his complaint, plaintiff makes conclusory allegations, with no factual assertions, in his first three counts that defendant's "customs, policies and/or practices" caused his injuries. But in Count IV of his complaint, plaintiff identifies the particular policies he avers were the driving force behind the constitutional violations. While he listed many aspects of these policies, they can all be summarized as the failure to train, supervise, and/or discipline defendant's employees. Plaintiff further alleged that defendant knew that these purported policies were "highly likely to cause violations of the constitutional rights of members of the public, including but not limited to Plaintiff herein."

The Court of Claims noted that

[a] custom or policy, for purposes of a constitutional tort claim, may be inferred from acts or omissions of a municipality's supervisory officials serious enough to amount to gross negligence or deliberate indifference to the constitutional rights of the plaintiff. *Payton v Detroit*, 211 Mich App 375, 399; 536 NW2d 233 (1995). In appropriate circumstances, this can include a failure to train officials. *York v Detroit (After Remand)*, 438 Mich 744, 755; 475 NW2d 346 (1991).

The court therefore found that, because plaintiff alleged that defendant knew that the SOR would be used to make decisions about arrests and prosecutions, yet did not properly train its officers regarding the 2011 changes to the SORA and how to ensure that the SOR was accurate, plaintiff's "failure-to-train" allegations were sufficient to state a claim against defendant for a constitutional tort.

requirement. Accordingly, we decline to offer an opinion on whether plaintiff has satisfied this threshold showing.

A defendant's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 US at 61. Our Supreme Court in *York* stated that "an alleged policy of inaction must reflect some degree of fault before it may be considered a policy upon which . . . liability may be based." *York*, 438 Mich at 755. Thus, "inadequate police training may serve as a basis for liability . . . 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Id.*, quoting *Canton v Harris*, 489 US 378, 388; 109 S Ct 1197; 103 L Ed 2d 412 (1989). This standard goes beyond mere negligence. *York*, 438 Mich at 757. Indeed, "[d]eliberate indifference contemplates knowledge, actual or constructive, and a conscious disregard of a known danger." *Id.* "Only then 'can such a shortcoming be properly thought of as a [state] 'policy or custom' that is actionable under § 1983." *Connick*, 563 US at 61, quoting *Canton*, 489 US at 389.

In general, to demonstrate "deliberate indifference" for purposes of a failure to train, a plaintiff must demonstrate that untrained employees engaged in "[a] pattern of similar constitutional violations" to those which the plaintiff alleges. *Connick*, 563 US at 62. That is because the state's "continued adherence to an approach that [it] know[s] or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequence of their action—the 'deliberate indifference'—necessary to trigger . . . liability." *Id.* (quotation marks and citation omitted). The *Connick* Court aptly reasoned that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Plaintiff here does not allege any such pattern. Instead, plaintiff only alleges that his, and no one else's, constitutional rights were violated.

However, this failure to identify a pattern of constitutional violations is not necessarily fatal to plaintiff's claims. In *Bd of Co Commr's of Bryan Co, Ok v Brown*, 520 US 397, 409; 117 S Ct 1382; 137 L Ed 2d 626 (1997), the United States Supreme Court opined that *Canton* left the door open such that "in a narrow range of circumstances," a plaintiff would not be required to prove a pattern of similar violations in order to show deliberate indifference. In *Canton*, the Supreme Court provided an example, where

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. [*Canton*, 489 US at 390 n 10.]

Thus,

> [t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the

municipality's indifference led directly to the very consequence that was so predictable. [*Bryan Co*, 520 US at 409.]

Explaining its earlier decision in *Bryan Co*, the Supreme Court stated that "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 US at 64. In other words, absent an allegation of a pattern of constitutional violations, it is this *direct and obvious causal link* between the failure to train and the deprivation of constitutional rights that demonstrates "deliberate indifference."

Here, plaintiff alleged in his complaint that defendant was confronted with an "obvious risk" that the failure to train its personnel would result in innocent people being arrested for crimes that they in actuality did not commit. Even accepting plaintiff's pleadings as true, we find that this is insufficient to satisfy the requirements under *Canton* and *Bryan Co*. In the *Canton* example, the city knew "to a moral certainty" that their armed police officers would be required to apprehend fleeing felons. *Canton*, 489 US at 390 n 10. Thus, with this knowledge, it would be "so obvious" that the failure to properly train its officers in the use of deadly force could amount to deliberate indifference to constitutional rights. *Id.* In other words, because the city knew that armed officers would be called upon to apprehend fleeing felons, the failure to train them in the proper use of deadly force would lead to the obvious and natural consequence of some fleeing felons being illegally shot, thereby depriving them of their constitutional rights. See *Bryan Co*, 520 US at 409.

In this case, by contrast, the alleged failure to train MSP employees in this SORA context does not carry the same obvious or clear dangers of a constitutional violation. That is because the failure to train employees on how to update the SORA after pertinent legislative changes does not possess the same direct causal link to a constitutional violation, being illegally arrested. Simply put, if someone erroneously is kept on the SOR when he or she should not have been, as happened in this instance, there is not the certainty that the person will later be arrested. Indeed, that resulting arrest would only occur if the person failed to keep the SOR updated with a correct address. This is distinguishable from the fleeing felon example in *Canton* because it is not "a moral certainty" or "patently obvious" that people who are on the SOR (properly or not) will fail to keep the SOR updated and be arrested as a result.[6] But on the contrary, it is commonly and readily understood that felons do indeed flee from the police. See *Connick*, 563 US at 63 ("Given the known frequency with which police attempt to arrest fleeing felons . . . ."). Thus, because of this lack of a "high degree of predictability" and a lack of direct causation of a

---

[6] We would also add that in addition to the person not reporting his or her current address, the person also would have to be unaware of the change in the law and fail to take any step to be removed from the SOR. This additional "step" further highlights how it is anything but a moral certainty that the failure to train MSP officers in how to update and maintain the SOR would result in a constitutional violation. Indeed, any attorney who had conducted legal research would have seen that, as a matter of law, defendant was not subject to SORA registration and thus could not be guilty of the offense which led to defendant's imprisonment.

constitutional violation, we hold that plaintiff's complaint does not allege sufficient facts to support a finding of deliberate indifference. Consequently, the Court of Claims erred when it denied defendant's motion for summary disposition under MCR 2.116(C)(8).

Reversed and remanded for entry of summary disposition in favor of defendant. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Michael F. Gadola
/s/ Jonathan Tukel