*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

GRANT BAUSERMAN, KARL WILLIAMS and TEDDY BROE, on Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs-Appellees,

v

UNEMPLOYMENT INSURANCE AGENCY,

        Defendant-Appellant.

FOR PUBLICATION
December 5, 2019
9:00 a.m.

No. 333181
Court of Claims
LC No. 15-000202-MM

ON REMAND

Before: GADOLA, P.J., and METER and FORT HOOD, JJ.

FORT HOOD, J.

This putative class action lawsuit returns to us on remand from the Michigan Supreme Court. In our first opinion in this case, in which plaintiffs allege a deprivation of their due process rights pursuant to Const 1963, art 1, § 17, we concluded that plaintiffs had not given timely notice of their due-process claims to defendant, the Michigan Unemployment Insurance Agency (the Agency) in compliance with MCL 600.6431(3). In an opinion decided April 5, 2019, the Michigan Supreme Court disagreed with our conclusion, reasoning that plaintiffs did not incur an "actionable harm" in their due-process claims until they were deprived of their property when their income tax refunds were seized or their wages were garnished. *Bauserman v Unemployment Ins Agency*, ___ Mich ____, ___; ____ NW2d ___ (2019) (Docket No. 156398); slip op at 18, 20-21.[1] Because plaintiffs Bauserman and Broe filed their claims in a timely

---

[1] Chief Justice MCCORMACK filed a concurring opinion questioning whether "the strict-compliance rule from [*McCahan v Brennan*, 492 Mich 730; 822 NW2d 747 (2012)] and [*Rowland v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007)] for notice of statutorily created claims applies to a due-process claim in particular, or to constitutional claims at all." *Bauserman*, ___ Mich at ___; slip op at 1 (MCCORMACK, C.J., concurring).

manner in compliance with MCL 600.6431(3), but plaintiff Williams did not, our Supreme Court affirmed in part and reversed in part our judgment and remanded to this Court with the directive that we "consider the Agency's argument that it is entitled to summary disposition on the ground that plaintiffs failed to raise cognizable constitutional tort claims." *Bauserman*, ___ Mich at ___; slip op at 21 n 20.

## I. BACKGROUND

We adopt the pertinent facts of this case from our Supreme Court's opinion:

> Plaintiffs are former recipients of unemployment compensation benefits who allege that the Agency unlawfully seized their property without affording due process of law. Plaintiff Bauserman received unemployment compensation from October 2013 through March 2014. In October 2014, the Agency sent Bauserman and his former employer, Eaton Aeroquip (Eaton), a questionnaire regarding suspected unreported earnings that Bauserman received while he was receiving unemployment compensation. Both Bauserman and Eaton responded that Bauserman had not worked for Eaton at the time. On December 3, 2014, the Agency sent Bauserman two notices of redetermination, one claiming that he had received unemployment compensation for which he was ineligible and the other claiming that he had intentionally misled the Agency or concealed information from it to obtain compensation for which he was not eligible. As a result, the Agency informed Bauserman that he owed $19,910 in overpayments, penalties, and interest. The next day, Bauserman submitted an online appeal through the Agency's website regarding its assertion that he had committed fraud, but did not submit a separate appeal regarding the Agency's determination that he had received compensation for which he was not eligible.

> From January 2015 through June 2015, the Agency sent Bauserman multiple notices stating the amount he owed to the Agency, informing him of missed payments on his debt, and raising the possibility that his wages would be garnished or his tax refunds seized. One of these communications consisted of a "notice of intent to reduce/withhold federal income tax refund," which warned Bauserman that "if you do not pay the amount shown or take other action described below within 60 days of the mail date on this form, the [Agency] will submit this benefit overpayment balance (restitution) to . . . the United States Department of Treasury . . . [which] will reduce or withhold any federal income tax refund you may be due and will instead forward that amount to the [Agency]." Around this same time, Bauserman sent multiple letters to the Agency attempting to explain the situation, two of which included an attached letter from Eaton explaining that Bauserman received one payment in 2014 for work performed in 2013 but was not employed by Eaton during the time he was receiving unemployment compensation. Finally, on June 16, 2015, the Agency intercepted Bauserman's state and federal income tax refunds.

> On September 9, 2015, Bauserman filed a putative class action against the Agency in the Court of Claims, alleging that the Agency had deprived him of his

property without providing due process of law. More specifically, he alleged that "Michigan's unemployment fraud detection, collection, and seizure practices fail to comply with minimum due process requirements." On September 30, 2015, the Agency issued two new notices of redetermination, rendering its December 3, 2014 redeterminations "null and void," and the Agency has since returned all monies seized from Bauserman.

On October 19, 2015, Bauserman filed an amended complaint, which added Teddy Broe and Karl Williams as named plaintiffs to the class action. Broe had received unemployment compensation from April 2013 to August 2013, and he had initially been determined eligible on the basis that he had been laid off by his employer, Fifth Third Bank (Fifth Third). However, Fifth Third challenged that determination, alleging that Broe voluntarily terminated his employment to attend school. The Agency then sent requests for information to Broe regarding his eligibility for compensation, and on July 15, 2014, it sent two notices of redetermination to Broe, the first claiming that he had received compensation for which he was ineligible because his termination of employment at Fifth Third "was voluntary and not attributable to the employer," and the second claiming that he had intentionally misled the agency or concealed information from it to obtain compensation that he was not eligible to receive. As a result, the Agency informed Broe that he owed $8,302 in overpayments, penalties, and interest.

From August 2014 through April 2015, the Agency sent Broe multiple notices stating the amount owed to the Agency, informing him of missed payments on the debt and raising the possibility that his wages would be garnished or his tax refunds seized. Specifically, on September 2, 2014, the Agency sent Broe a "notice of intent to reduce/withhold federal income tax refund" that was materially identical to the notice provided to Bauserman. In April 2015, Broe sent the Agency a letter appealing its redeterminations and claiming that he had not received the Agency's previous communications because they had been sent to him through his online account with the Agency, which he no longer accessed because he was reemployed and no longer seeking unemployment compensation. The Agency denied the appeal as untimely and, in May 2015, intercepted Broe's state and federal tax refunds. On November 4, 2015, the Agency issued two notices of redetermination, reversing its July 15, 2014 redeterminations that Broe was ineligible for compensation and had committed fraud. The Agency has since returned all monies seized from Broe.

Williams started working at Wingfoot Commercial Tire System in May 2011. When his employment with Wingfoot began, Williams was receiving unemployment compensation from a previous employer. Williams alleges that he advised the Agency that he was now receiving wages from Wingfoot, yet his unemployment compensation had not been altered; Williams believed that he was still entitled to unemployment compensation because his wages from Wingfoot were less than 1½ times his weekly compensation. See MCL 421.48(1). The Agency sent Williams a request to provide information regarding his employment with Wingfoot. On June 22, 2012, the Agency issued redeterminations that (1)

-3-

terminated Williams's receipt of future unemployment compensation, (2) asserted that he had already received compensation for which he was ineligible due to his employment with Wingfoot, and (3) alleged that he had intentionally misled the Agency or concealed information from it to obtain compensation for which he was not eligible.

On October 29, 2013, the Agency sent Williams a "notice of garnishment" stating that, if the amount owed was not provided to the Agency within 30 days, his "employer [would] be required to deduct and send to [the Agency] up to 25% of [his] disposable earnings each pay period until the debt is paid in full." Williams's wages were first garnished, at the latest, on May 16, 2014, and on May 27, 2014, the Agency sent Williams a "notice of intent to reduce/withhold federal income tax refund" that was materially identical to the notices provided to Bauserman and Broe. Williams sent a letter appealing the Agency's redeterminations on May 22, 2014. The Agency denied Williams's appeal as untimely, as did an administrative law judge. Finally, on February 19, 2015, the Agency seized Williams's federal income tax refund and continues to collect his debt by this means. [*Bauserman*, ___ Mich at ___; slip op at 2-6.]

In our first opinion in this case, this Court was presented with the following question:

[W]e are asked to determine whether the six months within which plaintiffs were required to file a notice of intention to file a claim, or the claim itself [in compliance with MCL 600.6431(3)], began to run (1) when defendant issued notices informing plaintiffs that they were disqualified from receiving unemployment benefits, or (2) when defendant actually seized plaintiffs' property. [*Bauserman v Unemployment Ins Agency*, unpublished per curiam opinion of the Court of Appeals, issued July 18, 2017 (Docket No. 333181), p 4.]

We answered this question by stating "that plaintiffs' cause of action accrued when the wrong on which they base their claims was done." *Bauserman*, unpub op at 7. Disagreeing with plaintiffs' argument that their cause of action arose when their federal and state income tax refunds were seized or their wages garnished, we held that because plaintiffs alleged a constitutional claim alleging a deprivation of due process, plaintiffs' cause of action accrued when the Agency first notified "plaintiffs of its determination that plaintiffs had engaged in fraudulent conduct, and they were not given the requisite notice and opportunity to be heard." *Bauserman*, unpub op at 9. We reversed the order of the Court of Claims denying the Agency's motion for summary disposition and remanded to the Court of Claims for entry of an order granting summary disposition in favor of the Agency. *Bauserman*, unpub op at 11.

Plaintiffs subsequently filed an application for leave to appeal in the Michigan Supreme Court, which scheduled oral argument on the application, directing the parties to address the following issues:

whether "the happening of the event giving rise to [appellants'] cause of action" for the deprivation of property without due process occurred when the appellee issued its allegedly wrongful notice of redetermination, or when the appellee

actually seized the appellants' property. MCL 600.6431(3); MCL 600.5827; cf. *Frank v Linkner*, 500 Mich 133, 149-153; 894 NW2d 574 (2017). [*Bauserman v Unemployment Ins Agency*, 501 Mich 1047 (2018).]

In its subsequent decision, the Michigan Supreme Court considered whether plaintiffs had complied with MCL 600.6431, which provides, in pertinent part:

(1) No claim may be maintained against the state unless the claimant, within 1 year after such claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against the state or any of its departments, commissions, boards, institutions, arms or agencies, stating the time when and the place where such claim arose and in detail the nature of the same and of the items of damage alleged or claimed to have been sustained, which claim or notice shall be signed and verified by the claimant before an officer authorized to administer oaths.

* * *

(3) In all actions for property damage or personal injuries, claimant shall file with the clerk of the court of claims a notice of intention to file a claim or the claim itself within 6 months following the happening of the event giving rise to the cause of action.

Our Supreme Court concluded that the dispositive question "is at what point plaintiffs first incurred or suffered the 'actionable harm' for a claim alleging a violation of predeprivation due process." *Bauserman*, ___ Mich at ___; slip op at 13. Our Supreme Court went on to recognize that "the 'actionable harm" in a pre-deprivation due-process claim occurs when a plaintiff has been deprived of property, and therefore such a claim 'accrues' when a plaintiff has first incurred the deprivation of property." *Id*. at ___; slip op at 15.

Accordingly, the Court of Appeals erred by holding that plaintiffs' due-process claims seeking monetary relief accrued when plaintiffs were deprived of process. Rather, these claims accrued only when they were deprived of property, as they incurred no harm before that deprivation. Because the accrual under MCL 600.5827 of a due-process claim seeking monetary relief "giv[es] rise to [a] cause of action" for purposes of MCL 600.6431(3), the six-month period from MCL 600.6431(3) was triggered when plaintiffs were deprived of property. [*Bauserman*, ___ Mich at ___; slip op at 18.]

Applying its holding to the facts of this case, our Supreme Court rejected the Agency's argument that plaintiffs were first deprived of property when initial redetermination notices were sent to the plaintiffs informing them of their financial liability, or when plaintiffs received the Agency's notice of its intention to intercept their tax returns or wages. Instead, our Supreme Court concluded that plaintiff Bauserman first incurred a deprivation of property when the Agency actually intercepted his federal and state income tax refunds, and therefore his September 9, 2015 complaint was filed in compliance with MCL 600.6431(3). *Bauserman*, ___ Mich at ___; slip op at 20. Our Supreme Court reached a similar conclusion with regard to

plaintiff Broe, holding that he first incurred a deprivation of property when the Agency seized his tax refunds in May 2015, thus his claims were also timely filed in accordance with MCL 600.6431(3). In contrast, plaintiff Williams incurred a deprivation of his property on May 6, 2014 when his wages were first garnished, and he did not comply with MCL 600.6431(3), because his claims were not filed within six months of that initial deprivation. *Bauserman*, ___ Mich at ___; slip op at 21. Observing that "[i]t is yet to be determined whether plaintiffs will succeed on their claims against the Agency," our Supreme Court stated the following instructions for this Court:

> [o]n remand, the Court of Appeals should consider the Agency's argument that it is entitled to summary disposition on the ground that plaintiffs failed to raise cognizable constitutional tort claims. [*Id.* ___; slip op at 21 n 20.]

## A. PROCEDURE IN THE COURT OF CLAIMS AS PERTINENT TO PLAINTIFFS' CONSTITUTIONAL TORT CLAIMS

Given that our Supreme Court has expressly directed that we consider the Agency's assertion that plaintiffs[2] did not allege cognizable constitutional tort claims, a brief background regarding the proceedings in the Court of Claims as pertinent to this issue is helpful in our analysis. In the Court of Claims, the Agency argued that it should not be held liable for plaintiffs' claims on the basis of governmental immunity. In this vein, the Agency asserted that plaintiffs could not pursue a constitutional tort claim against the Agency because other alternate remedies were available if plaintiffs pursued their appellate rights pursuant to the Michigan Employment Security Act, MCL 421.1 *et seq* (the MES Act). In response, plaintiffs countered that governmental immunity would not insulate the Agency from liability in this case, given that plaintiffs alleged a constitutional tort against the Agency, a department of the state of Michigan. Because the Agency acted pursuant to what plaintiffs characterized as an "unconstitutional custom or policy[,]" plaintiffs could pursue a claim for damages against it in state court, particularly given that plaintiffs could not pursue redress under 42 USC 1983. Plaintiffs also claimed that their administrative remedies were "inadequate" because appeals to the Agency were not handled in a competent, timely and responsive fashion. Observing that they were challenging "the entire [Agency] fraud-determination procedure, plaintiffs also questioned whether the Agency "is . . . empowered at any level to decide the constitutionality of its own customs and policies."

The Court of Claims held a hearing on the Agency's motion on March 8, 2016, and the parties advanced legal arguments consistent with their briefing in the Court of Claims. Specifically, during oral argument, counsel for plaintiffs stated, "[t]his case is not a super appeal of [an] individual fraud determination. Rather, this is a structural challenge to the constitutionality of [the] fraud determination and seizure process." According to plaintiff's counsel, "[plaintiffs are] not challenging the administration of the [MES Act]. We're challenging the constitutionality of the seizure that flows from a fraud finding that's made without due process of law." The Court of Claims issued a lengthy written opinion and order

---

[2] Our reference to plaintiffs is limited to plaintiff Bauserman and plaintiff Broe.

denying the Agency's motion to dismiss on May 10, 2016. In addressing whether plaintiffs could maintain a cause of action seeking damages for an alleged violation of the Michigan constitution, the Court of Claims, ruled, in pertinent part, as follows:

> However, defendant further argues that plaintiffs cannot establish an additional prerequisite for maintaining a constitutional tort claim. Following its decision in *Smith* [*v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987)], the [Michigan] Supreme Court in [*Jones v Powell*, 462 Mich 329; 612 NW2d 423 (2000)], further explained that "*Smith* only recognized a narrow remedy against the state on the basis of the unavailability of any other remedy. *Id*. at 337 (emphasis added). Relying upon the language in *Smith*, defendant argues that because plaintiffs could pursue the administrative process, they had "other remedies available," and therefore, they cannot maintain a constitutional tort claim. This Court finds defendant's argument unavailing. Simply put, the administrative process fails to afford sufficient relief to plaintiff's [sic] challenging an entire statutory and policy scheme. Therefore, a constitutional claim continues to be viable.

On remand, we now review the Court of Claims' decision regarding plaintiffs' claims alleging constitutional torts as instructed by our Supreme Court. *Bauserman*, ___ Mich at ___; slip op at 21 n 20.

## II. STANDARD OF REVIEW

While the Court of Claims did not specify under which subrule of MCR 2.116(C) it was denying the Agency's motion seeking dismissal of plaintiffs' claims alleging a violation of the state constitution, the Court of Claims did not consider material outside of the pleadings, and instead focused on whether plaintiffs had alleged valid constitutional claims as a matter of law. Accordingly, we review the decision of the Court of Claims denying the Agency's motion for summary disposition as having been granted pursuant to MCR 2.116(C)(8) (failure to state a claim). As this Court recently observed in *Kazor v Dep't of Licensing & Regulatory Affairs, Bureau of Professional Licensing*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 343249); slip op at 1-2:

> A motion under MCR 2.116(C)(8) tests the [legal] sufficiency of the complaint based on the pleadings alone, and we review a decision made pursuant to this subrule de novo. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). In reviewing a motion brought under MCR 2.116(C)(8), "[a]ll well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Id*. Judgment is properly granted under this subrule "when the claims are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Long v Liquor Control Comm*, 322 Mich App. 60, 67; 910 NW2d 674 (2017) (citation and quotations omitted).

## III. ANALYSIS

### A. CONSTITUTIONAL TORTS

At issue here is whether plaintiffs alleged cognizable constitutional tort claims allowing them to recover monetary damages arising from the alleged state due process violations they incurred as a result of the Agency's actions. Such claims originated in *Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 US 388, 389, 397; 91 S Ct 1999; 29 L Ed 2d 619 (1971), a case in which the United States Supreme Court recognized that the petitioner could pursue a cause of action for monetary damages against the respondents arising from injuries he suffered during an unlawful search and seizure in violation of the Fourth Amendment. Following *Bivens*, in the Michigan Supreme Court's memorandum opinion in *Smith*, the Court recognized that a majority of the justices agreed that "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith*, 428 Mich at 544. However, the *Smith* Court did not provide further guidance regarding the circumstances under which such a claim for damages may be judicially inferred. Accordingly, appellate courts have looked to Justice BOYLE'S concurring opinion in *Smith* for guidance concerning when a claim for damages arising from an alleged constitutional violation may be judicially inferred. See *Reid v Michigan*, 239 Mich App 621, 628; 609 NW2d 215 (2000) (recognizing that "[a]lthough an appropriate analysis for determining whether a constitutional tort had been established did not garner a majority opinion, Justice BOYLE'S extensive analysis of this issue has generally been utilized by this Court."); *Marlin v Detroit* (*After Remand*), 205 Mich App 335, 337-338; 517 NW2d 305 (1994).

In Justice BOYLE'S concurring opinion in *Smith*, she recognized that the ability to recover monetary damages arising from the violation of rights protected by the Michigan constitution is not provided by any general statute in Michigan. *Smith*, 428 Mich at 644 (BOYLE J., concurring in part). Therefore the inquiry that the *Smith* Court was presented with was whether such a remedy ought to be "inferred directly from protections found in the Michigan Constitution[.]" *Id*. (BOYLE, J. concurring in part). Justice BOYLE looked to *Bivens* as instructive in her analysis.

> We would recognize the propriety of an inferred damage remedy arising directly from violations of the Michigan Constitution in certain cases. *As the Bivens Court recognized, there are circumstances in which a constitutional right can only be vindicated by a damage remedy and where the right itself calls out for such a remedy.* On the other hand, there are circumstances in which a damage remedy would not be appropriate. *The absence of any other remedy would, as in Bivens, heighten the urgency of the question. Justice Harlan, concurring in Bivens, states that "[t]he question then, is, as I see it, whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted." 403 US at 407. In answering this question in the positive, Justice Harlan commented, "[f]or people in Bivens' shoes, it is damages or nothing." Id*. at p. 410. [*Smith*, 428 Mich at 647 (BOYLE, J. concurring in part) (emphasis added).]

Since *Smith*, this Court has recognized that a claim for damages resulting from an alleged violation of the state constitution will be recognized when "an official policy or custom caused a person to be deprived of [state] constitutional rights." *Carlton v Dep't of Corrections*, 215 Mich App 490, 505; 546 NW2d 671 (1996). More recently, this Court looked to the multifactor balancing test set forth in Justice BOYLE'S opinion in *Smith* in determining whether, in a case in which the plaintiffs alleged a claim for injury to their bodily integrity arising from their exposure to contaminated water, it was appropriate to infer a damage remedy for an alleged violation of

Const 1963, art 1, § 17. *Mays v Governor*, 323 Mich App 1, 65; 916 NW2d 227 (2018), lv gtd ___ Mich ___ (2019)[3] (Docket Nos. 157335-7; 157340-2).

> To apply the test, we consider the weight of various factors, including, as relevant here, (1) the existence and clarity of the constitutional violation itself, (2) the degree of specificity of the constitutional protection, (3) support for the propriety of a judicially inferred damage remedy in any "text, history, and previous interpretations of the specific provision," (4) "the availability of another remedy," and (5) "various other factors" militating for or against a judicially inferred damage remedy. See *Smith*, 428 Mich at 648-652; 612 NW2d 423 (BOYLE, J., concurring in part). [*Mays*, 323 Mich App at 65-66.]

On appeal, the Agency initially contends that plaintiffs have not established that the Agency acted pursuant to a state policy or custom that mandated the alleged unlawful actions.[4] The Agency further argues that plaintiffs are precluded from recovering damages for the alleged constitutional violations because the administrative review process for issues with unemployment benefits set forth in the MES Act provides an adequate remedy for plaintiffs to address these alleged constitutional violations. More specifically, the Agency asserts that the administrative process provides an adequate procedure for reviewing plaintiffs' constitutional claims because administrative decisions pertaining to unemployment benefits are subject to review by the Michigan Compensation Appellate Commission (MCAC), the circuit court and the appellate courts of this state. In response, plaintiffs assert that the present case is an appropriate one for this Court to infer a remedy for monetary damages arising from the violations of the state constitution that plaintiffs incurred. Specifically, plaintiffs counter the Agency's assertion that they have an adequate remedy by pursuing the administrative process set forth in the MES Act to adjudicate their constitutional claims, particularly because that administrative process is procedurally flawed, resulting in claimants being denied rudimentary due process. Plaintiffs further claim that the administrative process is not the appropriate forum to address the substance of the constitutional claims at issue here. Addressing other potential alternate avenues for

---

[3] In its order granting leave in *Mays*, our Supreme Court has directed the parties, as pertinent to this appeal, to brief the issue:

> whether the Court of Appeals erred in recognizing a constitutional tort for violation of bodily integrity under Const 1963, art 1, § 17, and, if not, whether the plaintiffs properly alleged such a violation, and whether a damages remedy is available for such a violation, see *Smith v Dep't of Public Health*, 428 Mich 540 (1987); *Jones v Powell*, 462 Mich 329 (2000)[.] [*Mays v Governor*, ___ Mich ___ (2019) (Docket Nos. 157335-7; 157340-2)].

[4] The parties do not dispute that Const 1963, art 1, § 17 protects plaintiffs' right to not be "deprived of . . . property[ ] without due process of law." For example, in its reply brief on appeal, the Agency, citing *Sidun v Wayne Co Treasurer*, 481 Mich 503, 509; 751 NW2d 453 (2008), acknowledges that before the state takes property from its owner, its actions must be compliant with due process.

redress, plaintiffs also point out that they cannot sue the Agency in federal or state court under 42 USC 1983.

## B. OFFICIAL POLICY OR CUSTOM

As this Court recently observed in *Mays*, the state may only be held responsible for an alleged violation of the state constitution "where the state's liability would, but for the Eleventh Amendment, render it liable under the standard for local governments as set forth in 42 USC 1983 and articulated in [*Monell v New York City Dep't of Social Servs*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978)]." *Mays*, 323 Mich App at 62 (citation and quotation marks omitted). In *Johnson v Vanderkooi*, 502 Mich 751, 762; 918 NW2d 785 (2018), our Supreme Court clarified that for liability to be imposed under 42 USC 1983, a showing must be made that "(1) a plaintiff's federal or statutory rights were violated and (2) *the violation was caused by a policy or custom of the municipality*."[5] (Emphasis added.) See also *Holeton v City of Livonia*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket Nos. 341624, 341847); slip op at 8 (holding "that the plaintiff must plead and be able to prove that the municipality's policy or custom led to the deprivation of the federal constitutional or statutory right at issue" in a suit brought pursuant to 42 USC 1983).

In *Johnson*, our Supreme Court noted that an official policy need not be memorialized in writing as a prerequisite for liability. *Johnson*, 502 Mich at 763-764. Moreover, a governmental custom may provide a foundation for liability if it is a "permanent and well settled" practice that governmental officials and employees act in accordance with. *Id*. at 764 (citation and quotation marks omitted). "Thus, accepted, though unwritten, practices of executing governmental policy may give rise to liability for the purposes of *Monell*." *Id*. Additionally, if governmental resources are used to "develop and implement practices and procedures[,]" this too can establish that an official governmental policy exists. *Id*. The *Johnson* Court also stated that "a municipality may be held liable for unlawful actions that it sanctioned or authorized, as well as for those that it specifically ordered[ ]" and that liability will flow from concerted choices "to follow a course of action [that] is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 765-766, quoting *Pembaur v Cincinnati*, 475 US 469, 483-484; 106 S Ct 1292; 89 L Ed 2d 452 (1986). Similarly, in *Mays*, this Court, also guided by *Pembaur*, held that " '[a] single decision' " by a policymaker or governing body 'unquestionably constitutes an act of official government policy,' regardless of whether 'that body had taken similar action in the past or intended to do so in the future[.]'" *Mays*, 323 Mich App at 63, quoting *Pembaur*, 475 US at 480. The *Mays* Court quoted with approval the following passage from *Pembaur*:

> To be sure, "official policy" often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed

---

[5] In this case, given that plaintiffs allege state constitutional violations against the Agency, a department of the state of Michigan, we must discern whether plaintiffs' allegations, if demonstrated to be correct, establish that the alleged constitutional violations were caused by a policy or custom of the state of Michigan.

plans of action to be followed under similar circumstances consistently and over time. That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary. However . . . a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the [government] is equally responsible whether that action is to be taken only once or to be taken repeatedly. [*Mays*, 323 Mich App at 63, quoting *Pembaur*, 475 US at 480–481.]

With regard to causation, the *Johnson* Court has also instructed, in pertinent part:

> Once a municipal policy or custom has been identified, a plaintiff must then show that the policy or custom was also the "moving force" behind the action that gave rise to the alleged constitutional violation. *Monell*, 436 US at 694. In other words, the policy or custom must be the cause of the violation. [*Johnson*, 502 Mich at 767.]

In this case, plaintiffs have alleged that the Agency systemically, and by way of concerted and coordinated actions, unlawfully intercepted their state and federal tax refunds, garnished their wages, and forced plaintiffs to repay unemployment benefits that they had lawfully received. The first amended complaint further alleges that the Agency, in violation of state law, imposes penalties on individuals in receipt of unemployment benefits and collects interest also not authorized by state law. Plaintiffs claim that the Agency has taken these actions under the following circumstances: (1) without providing "required notice of the bases asserted for disqualification [of unemployment benefits,]" or a hearing, (2) by not allowing plaintiffs to present evidence in their own defense, and (3) by using an automated computerized system "for the detection and determination of [alleged] fraud cases," which does not comport with due process. Plaintiffs specifically allege that the Agency uses the Michigan Integrated Data Automated System (MiDAS), "an automated decision-making system" to spot suspected fraud in the receipt of unemployment benefits, and that MiDAS "initiates an automated process" that can result in an individual being disqualified from receiving benefits, as well as having penalties imposed and being subjected to criminal prosecution. All of this, plaintiffs allege, occurs without plaintiffs being provided with notice, an opportunity to be heard and being allowed to present evidence in their defense.

These allegations, if established to be true and correct, certainly demonstrate that plaintiffs' rights to due process as guarded by Const 1963, art 1, § 17 were violated, and that the alleged violations "arose from actions taken by state actors pursuant to governmental policy." *Mays*, 323 Mich App at 64. In our opinion, the Agency's use of the MiDAS system to allegedly disqualify plaintiffs from receipt of unemployment benefits, accuse them of fraudulent receipt of unemployment benefits, and to engage in a concerted system of unlawfully imposing penalties, interest and intercepting the financial resources of the plaintiffs can be aptly characterized as an established practice of state governmental officials such that it amounts to a custom supported by

the force of law. *Johnson*, 502 Mich at 764. Accordingly, we reject the Agency's assertion that plaintiffs' claims in this regard are legally deficient, given that the allegations plaintiffs advance, if proven to be correct, amply demonstrate that plaintiffs' constitutional rights were violated as a result of the Agency's use of its policy or custom in administering the unemployment benefit system. *Id*. at 762.

## C. SHOULD A DAMAGE REMEDY BE INFERRED IN THIS CASE?

We now turn our attention to the multi-factor analysis first stated by Justice BOYLE in *Smith* and which this Court more recently highlighted in its decision in *Mays*. In its brief on appeal, the Agency focuses its argument on the fact that the Agency's administrative process, mandated by the MES Act, provides a sufficient remedy to redress plaintiffs' alleged injuries. However, we will nonetheless weigh all of the factors that Justice BOYLE articulated in *Smith*. The first factor requires that we weigh the "existence and clarity of the constitutional violation itself[.]" *Mays*, 323 Mich App at 65. Const 1963, art 1, § 17 provides, in pertinent part:

> No person shall be compelled in any criminal case to be a witness against himself, *nor be deprived of life, liberty or property, without due process of law.* [Emphasis added.][6]

As our Supreme Court recognized in its opinion in this case, the thrust of plaintiffs' allegations against the Agency are as follows:

> Plaintiffs allege that the Agency violated their due-process rights under the Michigan Constitution when it (1) seized their property without reasonable notice and an opportunity to be heard and (2) engaged in unlawful collection practices. [*Bauserman*, ___ Mich at ___; slip op at 13.]

Citing its earlier decision in *Bonner v Brighton*, 495 Mich 209, 225-226; 848 NW2d 380 (2014), our Supreme Court also recounted the protections that the Due Process Clause provides:

> The Due Process Clause precludes the state from (1) depriving one of life, liberty, or property (2) without due process of law. Clearly, the clause is violated only if there has been a deprivation of life, liberty, or property. [*Bauserman*, ___ Mich at ___; slip op at 14.]

---

[6] Notably, in *Smith*, Justice BRICKLEY, joined by Justice RILEY, opined that the courts of this state "should defer to the Legislature the question whether to create a damages remedy for violations of a plaintiff's right to due process or equal protection." See *Lewis v State*, 464 Mich 781, 787; 629 NW2d 868 (2001), quoting *Smith*, 428 Mich at 631-632 (opinion by BRICKLEY, J.) (footnote omitted.) However, the Michigan Supreme Court has not yet addressed whether a judicially inferred remedy for monetary damages is "ever appropriate" under the Due Process Clause of the state constitution, Const 1963, art 1, § 17. *Lewis*, 464 Mich at 787 n 3.

Because plaintiffs allege that the Agency violated Const 1963, art 1, § 17 in seizing their property without providing them with adequate notice and an opportunity to be heard, given the "existence and clarity of the [alleged] constitutional violation itself," *Mays*, 323 Mich App at 65, we conclude that the first factor weighs in favor of judicially inferring a remedy for monetary damages. See also *Sidun v Wayne Co Treasurer*, 481 Mich 503, 509; 751 NW2d 453 (2008) (recognizing that a citizen has the "constitutional right to due process of law before the government takes . . . property.").

The second and third factors address "the degree of specificity of the constitutional protection," as well as if there is support for a judicially inferred damage remedy in the " 'text, history and previous interpretations' " of Const 1963, art 1, § 17. *Mays*, 323 Mich App at 65-66, quoting *Smith*, 482 Mich at 650, 651 (BOYLE, J. concurring in part). While we acknowledge Justice BOYLE'S general concerns in *Smith* that the protections inherent in due process may not be as well-defined as the search and seizure protections embedded in the Fourth Amendment and at issue in *Bivens*, *Smith*, 428 Mich at 651 (BOYLE, J. concurring in part), we nonetheless are satisfied that the due process protections at issue in this case are clear and definitive enough that this factor weighs in favor of inferring a judicial remedy. Plaintiffs allege that they were deprived of their property in violation of Const 1963, art 1, § 17, and even though due process is flexible and the procedural protections that it offers may vary depending on the circumstances, "the Due Process Clause secures an absolute right to an opportunity for a meaningful hearing" and an opportunity to be heard before individuals are deprived of their property. *Dow v State of Michigan*, 396 Mich 192, 204-205; 240 NW2d 450 (1976). Additionally, with regard to the third factor, concerning whether support for a judicially inferred remedy exists in the text of Const 1963, art 1, § 17, we observe that unlike Const 1963, art 1, § 2, the plain language of Const 1963, art 1, § 17 does not leave the implementation of a private cause of action to the Legislature. Specifically, in *Lewis v State*, 464 Mich 781, 782; 629 NW2d 868 (2001), our Supreme Court held that it would be "inappropriate to infer . . . a damages remedy" with respect to Const 1963, art 1, § 2, because the plain language of that constitutional provision, providing that "[n]o person shall be denied the equal protection of the laws" also expressly stated that "[t]he legislature shall implement this section by appropriate legislation."

> On its face, the implementation power of Const 1963, art 1, § 2 is given to the Legislature. Because of this, for this Court to implement Const 1963, art 1, § 2 by allowing, for example, money damages, would be to arrogate this power given expressly to the Legislature to this Court. Under no recognizable theory of disciplined jurisprudence do we have such power.

> * * *

> Given the language of the Michigan Constitution, we hold in this case that we are without proper authority to recognize a cause of action for money damages or other compensatory relief for past violations of Const 1963, art 1, § 2. [*Lewis*, 464 Mich at 787, 789.]

Moreover, while the United States Supreme Court, in its most recent pronouncement on the validity of the *Bivens* remedy, has reiterated that caution must be employed before extending the *Bivens* remedy into new contexts, it also acknowledged that the United States Supreme Court

-13-

had permitted a *Bivens* action in the context of the Fifth Amendment Due Process Clause in a case alleging gender discrimination. *Ziglar v Abbasi*, ___ US ___, ___; 137 S Ct 1843, 1854, 1857; 198 L Ed 2d 290 (2017), citing *Davis v Passman*, 442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979).[7] Accordingly, we likewise conclude that the third factor weighs in favor of a judicially inferred remedy for damages.

As noted earlier in this opinion, the Agency focuses its argument on the fourth factor at issue, that being whether plaintiffs have another remedy available to them. *Smith*, 428 Mich at 651 (BOYLE, J., concurring in part); *Mays*, 323 Mich App at 66. Specifically, the Agency contends that plaintiffs have an alternate remedy available to them because they can seek redress through the administrative system established by the MES Act. The MES Act provides for the payment of unemployment benefits, MCL 421.27, a person's eligibility to receive unemployment benefits, MCL 421.28, criteria for disqualification for benefits, MCL 421.29, the procedures governing determinations of unemployment benefits, MCL 421.32, as well as review of determinations leading to a redetermination of benefits, MCL 421.32a. Challenges to unemployment benefit redeterminations are "referred to the Michigan administrative hearing system for assignment to an administrative law judge." MCL 421.33. If a case is transferred to an administrative law judge, "all matters pertinent to the claimant's benefit rights . . . under this act shall be referred to the administrative law judge." MCL 421.33. A party may also proceed with an appeal from a decision of an administrative law judge to the MCAC. MCL 421.33(2). The MCAC "has full authority to handle, process and decide appeals filed under [MCL 421.33(2)]." MCL 421.34(1). Additionally, MCL 421.38(1) provides that a claimant may file an appeal to the circuit court, and the circuit court may "review questions of fact and law on the record made before the administrative law judge and the Michigan compensation appellate commission[,]" but may also "make further orders in respect to that order or decision as justice may require." MCL 421.38(2) provides for a direct appeal to the circuit court from an order of an administrative law judge "if the claimant and the employer or their authorized agents or attorneys agree to do so by written stipulation filed with the administrative law judge." Additionally, "[t]he decision of the circuit court may be appealed in the manner provided by the laws of this state for appeals from the circuit court." MCL 421.38(4).

Our review of this legislative scheme leads to the conclusion that while the administrative process established by the MES Act allows for the review of the Agency's decisions with respect to the award or disqualification of unemployment benefits, or pertaining to its imposition of penalty and interest, it does not provide an avenue for plaintiffs to seek redress in the form of monetary relief for the alleged violation of their due process rights protected by the state constitution. See *Mays*, 323 Mich App at 67 (observing that the proper inquiry is whether "a judicially imposed damage remedy for the alleged constitutional violation is the only available avenue for obtaining *monetary* relief.") (Emphasis added.) Further, while the procedure

---

[7] In *Bauserman*, our Supreme Court noted that because of the "textual similarities between the state and federal Due Process Clauses," this Court may look to United States Supreme Court cases as persuasive authority, even though plaintiffs only allege a violation of their state constitutional due process rights. *Bauserman*, ___ Mich at ___; slip op at 14 n 12.

-14-

established by the MES Act establishes a way for claimants to challenge the Agency's decision regarding their unemployment benefits, we agree with the Court of Claims that it does not provide a suitable avenue for plaintiffs to challenge the Agency's alleged systemic and concerted deprivation of their due process rights promulgated by the Agency's implementation of the MiDAS system. Put another way, we disagree with the Agency that the administrative process as set forth in the MES Act provides a remedy for plaintiffs to seek redress for the due process violations that they allege they suffered as result of the Agency's alleged unlawful actions. See *id*. at 70 (concluding that the federal Safe Water Drinking Act, 42 USC 300f *et seq*. and the Michigan Safe Drinking Water Act, (MSDWA), MCL 325.1001 *et seq*. "do not provide an alternative remedy for plaintiffs' claim of injury to bodily integrity" as a result of the alleged contamination of their water supply). While we are aware that this Court has addressed a First Amendment claim in the context of reviewing an unemployment benefits determination, *Shirvell v Dep't of Attorney General*, 308 Mich App 702, 732-749; 866 NW2d 478 (2015), the present case is not one where the plaintiffs are merely disputing the determination of their individual employment benefits. Instead, plaintiffs are mounting a direct and large scale challenge to the Agency's administrative process leading to the seizure of their property without their consent, which plaintiffs assert was done in violation of their right to due process protected by Const 1963, art 1, § 17. In sum, because of the factual and procedural backdrop of this case, we disagree with the Agency that the existing administrative process as set forth in the MES Act, including the judicial review provided by the courts of this state, provides plaintiffs with a remedy to pursue their constitutional claims in this case.

Moreover, while the Agency points to *Jones* in support of its argument, because the state of Michigan enjoys the protection of immunity under the Eleventh Amendment in a lawsuit seeking monetary damages filed in any court under 42 USC 1983 for an alleged violation of rights protected by the federal constitution or a federal statute, plaintiffs do not have the same access to a remedy that the plaintiffs in *Jones* did. Unlike the instant case, in *Jones* our Supreme Court observed that the plaintiff did have an alternate remedy available because she could pursue an action in federal or state court under 42 USC 1983 against a municipality or an individual defendant without implicating immunity under the Eleventh Amendment. *Jones*, 462 Mich at 337.

Additionally, the present case is factually and legally distinguishable from the persuasive authority of the United States Supreme Court's decision in *Schweiker v Chilicky*, 487 US 412, 414; 108 S Ct 2460; 101 L Ed 2d 370 (1988), in which the Court declined to extend *Bivens* to a case in which the respondents were improperly denied Social Security disability benefits and alleged federal due process violations against the government officials administering the federal Social Security program. In *Schweiker*, the United States Supreme Court looked to its earlier decision in *Bush v Lucas*, 462 US 367, 368; 103 S Ct 2404; 76 L Ed 2d 648 (1983), noting that in circumstances in which Congress had not taken action in enacting legislation to provide a complete remedy for individuals asserting constitutional claims, such inaction would weigh against the imposition of a *Bivens* remedy. *Schweiker*, 487 US at 423.

> In sum, the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" [as first articulated in *Bivens*] has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests

that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies. [*Id*., quoting *Bivens*, 403 US at 396.]

Specifically, the *Schweiker* Court observed that the respondents, after exhausting their administrative remedies within the Social Security system, could seek judicial review, "including review of constitutional claims." *Schweiker*, 487 US at 424, citing *Heckler v Ringer*, 466 US 602, 615; 104 S Ct 2013; 80 L Ed 2d 622 (1984) and *Weinberger v Salfi*, 422 US 749, 762; 95 S Ct 2457; 45 L Ed 2d 522 (1975) (recognizing that "the Social Security Act itself provides jurisdiction for constitutional challenges to its provisions."). The *Schweiker* Court also concluded that because Congress did not "make any provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits[,]" where such a remedy was not included in "the elaborate remedial scheme devised by Congress," it was not available to the respondents. *Schweiker*, 487 US at 414, 424. Notably, *Schweiker* did not involve highly egregious facts such as those alleged in the instant case. Specifically, in *Schweiker*, the respondents were wrongfully withheld Social Security disability benefits as a result of a new review procedure, *id*. at 416, 417-418, whereas plaintiffs in this case claim that their own monetary funds were wrongfully taken by the Agency after they faced unsubstantiated allegations of fraud and were not given the opportunity to defend against such accusations. Under such circumstances, we are not persuaded that the administrative procedures and judicial review provisions set forth in the MES Act, which admittedly do not expressly allow individuals to recover monetary damages as a result of alleged state constitutional violations, provide a remedy to plaintiffs in this case to the extent that a judicial remedy cannot be inferred.

Finally, similar to the conclusion this Court reached in *Mays*, we afford "significant weight" to the "outrageousness" of the misconduct by the Agency that plaintiffs allege in this case, and we conclude that it weighs in favor of a judicially inferred damage remedy. *Mays*, 323 Mich App at 72. Specifically, plaintiffs allege that the Agency, relying on an automated system, systematically engaged in a series of concerted actions that wrongfully accused thousands of innocent citizens of this state of fraud and the unlawful receipt of unemployment benefits without grounds for doing so.[8] The MES Act is intended to "safeguard the general welfare through the dispensation of benefits intended to ameliorate the disastrous effects of involuntary unemployment." *Korzowski v Pollack Indus*, 213 Mich App 223, 228-229; 539 NW2d 741 (1995) (quotation marks and citation omitted). Instead, the procedure at issue allegedly deprived plaintiffs and the others impacted by the Agency's actions of their due process rights as they were saddled with undeserved and unnecessary penalties and interest and were forced to endure the garnishment of wages and state and federal income tax refunds that individuals in this state rely on to survive. Indeed, the absolutely "egregious nature[,]" *Mays*, 323 Mich App at 72, of the Agency's alleged actions in this case may have led to the undermining of the due process

---

[8] While the Court of Claims has not yet ruled on plaintiffs' motion seeking class certification, we observe that plaintiffs assert that the number of claimants impacted by the Agency's alleged unlawful actions is in the range of 26,000.

rights of thousands of innocent citizens across this state at a particularly vulnerable time in their lives, having lost their gainful employment for one reason or another. Consequently, if plaintiffs' allegations are borne out in the course of this litigation, this would be a case where a judicially inferred damage remedy is appropriate to safeguard the constitutional protections that we as a citizenry in a democracy hold inviolate. In simple terms, the alleged disturbing facts of this lawsuit would call out for such a remedy.

Considering the factors set forth in Justice BOYLE'S opinion concurring in part in *Smith* and as clarified by this Court recently in *Mays*, we conclude that this multifactor approach weighs in favor of recognizing a judicially inferred damage remedy in this case for the due process deprivations that plaintiffs allege they suffered as a result of the Agency's unlawful actions. We therefore agree with the Court of Claims' determination that summary disposition was not warranted.[9]

## IV. CONCLUSION

The May 10, 2016 opinion and order of the Court of Claims denying the Agency's motion to dismiss is affirmed. Plaintiffs, as the prevailing parties, may tax costs pursuant to MCR 7.219.

/s/ Karen M. Fort Hood
/s/ Patrick M. Meter

---

[9] Given our analysis of this issue concluding that plaintiffs have alleged a valid constitutional claim against the Agency, governmental immunity does not shield the Agency from liability. *LM v State*, 307 Mich App 685, 694; 862 NW2d 246 (2014).